## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

GEORGIA STATE CONFERENCE
OF THE NAACP; TROUP COUNTY
NAACP; PROJECT SOUTH; ESTATE
OF CHARLES BREWER; CALVIN
MORELAND; APRIL WALTON;
PAMELA WILLIAMS; JOHN DOE
#1; JOHN DOE #2; and JOHN DOE
#3,

          *Plaintiffs*,

v.

CITY OF LAGRANGE, GEORGIA,

          *Defendant.*

Case No. 3:17-cv-0067-TCB

**FIRST AMENDED
COMPLAINT FOR
DECLARATORY
& INJUNCTIVE RELIEF
AND FOR DAMAGES**

**Jury Trial Demanded**

## INTRODUCTION

1.     Through this action, Plaintiffs Georgia State Conference of the National Association for the Advancement of Colored People ("Georgia NAACP"), Troup County Chapter of the National Association for the Advancement of Colored People ("Troup County NAACP"), Project South, the Estate of Charles Brewer ("Plaintiff Brewer"), Calvin Moreland, April Walton, Pamela Williams, and John Does #1 through #3 seek to vindicate their rights, and the rights of the organizations' members, under the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601 *et seq.*, the United States Constitution, and Georgia law.

2.     Plaintiffs' claims arise from two policies concerning the provision of municipal utilities by Defendant City of LaGrange, Georgia ("City" or "LaGrange"). Both policies restrict access to vital utility services including electricity, gas, and water, making it difficult or impossible for some of the City's most economically disadvantaged residents to live in LaGrange. These policies disproportionately harm African Americans and Latinos and deprive low-income, debt-saddled LaGrange residents of equal protection and other protections due under the law.

3.     Under the first challenged policy (hereinafter, the "Court Debt Policy"), the City conditions access to basic utility services on the payment of unrelated fines assessed by the LaGrange Municipal Court. The LaGrange City Code requires that

2

"[a]ny applicant for utility service who owes an unpaid utility bill or other debt to the city, including but not limited to court judgments and fines, shall pay such unpaid bill or debt *prior to obtaining utility service*." LaGrange Mun. Code § 20-1-7(h) (emphasis added). The Code further provides that "[c]ustomers who owe debts to the city of any type shall be subject to having utility services terminated for failure to pay said debts without any prior notice from the city." *Id.*

4.     The City's Collection Department invokes this ordinance in letters to utility customers that threaten service disconnections if the customers do not pay court debt. An example of this type of letter sent by the City in recent years is attached as Exhibit A.

5.     Further, the City's Utilities Department requires, as a condition of obtaining service, that applicants acknowledge the City's purported authority to withhold utility services because of court debt. A copy of the utility application form utilized by the City is attached as Exhibit B.

6.     No provision of Georgia law authorizes municipalities or utility providers to collect unpaid court debt by withholding or terminating utility services, or by threatening to do either. In fact, common law duties owed by utility providers such as the City *prohibit* this practice.

7.     The City's Court Debt Policy has a severe and unjustified disparate impact on African Americans. African Americans are significantly overrepresented within the group of people who are subject to utilities disconnection because of the Court Debt Policy, and the households in LaGrange that are affected by the Court Debt Policy are concentrated in predominantly African American neighborhoods.

8.     The City has had notice of the Court Debt Policy's impact on African Americans, yet has taken no steps to revise or amend the Policy to lessen that impact.

9.     The Mayor of LaGrange, Jim Thornton, has sought to justify the Court Debt Policy as an alternative to jailing people who owe court-related debts to the City—a practice that, with respect to indigent people who cannot pay their court debts, would also be unlawful. Justifying a policy with demonstrated, disproportionate harm to a protected group on the ground that it is an alternative to another act that is itself unconstitutional is no justification at all.

10.     The City could pursue any legitimate interest it has in ensuring that court-related debts are paid through other, less discriminatory and less draconian measures than denying, suspending, terminating, or threatening to cut off access to utilities.

11.     Under the second challenged policy, the City has required an individual seeking utility services to provide a valid Social Security Number ("SSN") and a

form of photo identification issued by the United States or by a state government—two documents that many immigrants, including many who are lawfully present, are categorically ineligible to obtain. This policy (hereinafter referred to as the "Immigrant Utilities Policy") has withheld essential utilities, including water, electricity, and gas, from individuals who could not produce both documents.

12.     The City further restricts these individuals' ability to obtain utilities by criminalizing the act of opening a utility account in one's own name on behalf of someone else who does not have an SSN and a form of photo identification that is acceptable to the City. *See* LaGrange Mun. Code § 20-1-11 (penalizing anyone who "obtain[s] or attempt[s] to obtain utility service . . . by providing false information during the application process."); *see also* LaGrange Mun. Code § 1-1-6 (punishing any ordinance violation with a fine of up to $1,000 and/or a sentence of either imprisonment or hard labor of up to six months).

13.     The City's Immigrant Utilities Policy disproportionately harms Latinos, who are overrepresented within the group of people affected by the policy as compared to their representation in the City's general population.

14.     The Mayor and other City policymakers have been put on notice that the City's Immigrant Utilities Policy disproportionately hinders Latinos' ability to live in LaGrange and to receive the same housing opportunities as non-Latinos, yet

it continues to enforce the Policy, and has conditioned access to utilities on a person's ability to produce an SSN and a form of photo identification the City deems acceptable.

15.    The City could satisfy any legitimate interest in ensuring a utility account holder's identity or credit history by accepting other forms of identification, such as an Individual Taxpayer Identification Number ("ITIN") and passports or other photo identification documents issued by other nations—forms of identification that are widely accepted by other utilities providers throughout Georgia and the United States.

16.    The denial and/or restriction of the only available utility services— which are necessary to maintain housing—under the City's Court Debt and Immigrant Utilities Policies makes housing unavailable; imposes different terms and conditions; makes resident vulnerable to exploitation; and interferes with individuals' and households' ability to live in the housing of their choice. The City's Court Debt and Immigrant Utilities Policies have an unjustified adverse impact on African Americans and Latinos in violation of the federal Fair Housing Act.

17.    The City's Court Debt and Immigrant Utilities Policies also violate the City's common-law duty to provide utilities on reasonable and nondiscriminatory terms to *all* individuals who wish to reside in the City. *See Gas Light Co. of*

*Columbus v. Ga. Power Co.*, 225 Ga. 851, 853 (1969). Under Georgia law, the City is specifically prohibited from conditioning access to utilities on collateral matters unrelated to the delivery of utility services. *See Walton Elec. Membership Corp. v. Snyder*, 226 Ga. App. 673, 678 (1997), *aff'd* 270 Ga. 62 (1998).

18.    The City's Court Debt Policy additionally violates the Equal Protection Clause of the United States Constitution by subjecting individuals who owe debt to the City to unduly harsh and discriminatory treatment as compared to other civil judgment debtors. *James v. Strange*, 407 U.S. 128 (1972).

19.    The City's enforcement of its Court Debt and Immigrant Utilities Policies has harmed Plaintiffs and continues to cause ongoing, irreparable, economic and non-economic harm to Plaintiffs.

20.    Plaintiffs Moreland, Brewer, and Walton have lived under the threat of losing basic utilities due to an inability to pay their utility and unrelated court debt. For each of them, the ever-present and imminent threat of disconnection has caused extreme anxiety and emotional distress, including the stress of knowing they would be forced to leave their homes in LaGrange and suffer the significant personal hardship that would come from such loss. Mr. Brewer endured this anxiety while suffering from separate serious health ailments that ultimately led to his death. While Plaintiff Walton continues to live in LaGrange under the burden of the City's Court

Debt Policy, Plaintiff Moreland was motivated in part by the Court Debt Policy to move away from his home in LaGrange and will not return because of the Policy.

21.     Plaintiff Williams has lost rental income from tenants who were subject to disconnection at the time of the filing of the original complaint because of the Court Debt Policy, and has suffered emotional distress over the application of the Court Debt Policy to her tenants.

22.     Plaintiffs John Does #1 through #3 are unable to secure utilities in their own name, which causes personal and family hardship, as well as emotional distress. In addition, Plaintiff John Doe #3 is subject to the daily threat of criminal prosecution because he has obtained utility service in the name of a third party who does not live in or own his current residence.

23.     Plaintiffs Georgia NAACP, Troup County NAACP, and Project South (collectively, "Organizational Plaintiffs") are membership organizations, and each has members who likewise are subjected to the Court Debt or Immigrant Utilities Policies, and suffer similar, ongoing harm as a result.

24.     Plaintiff Georgia NAACP has furthermore suffered and will continue to suffer injury in its own right because the City's Court Debt Policy frustrates its mission of eradicating discrimination and promoting political, educational, social,

and economic equality. As a result, it has had to divert resources away from other programs and projects in order to combat the City's discrimination.

25.     To remedy these injuries and prevent future harms to Plaintiffs and others affected by the City's unlawful Policies, Plaintiffs seek a declaratory judgment, preliminary and permanent injunctive relief, and damages.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 3613. The Court has additional remedial authority under 28 U.S.C. §§ 2201-02.

27.     The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), because those claims arise out of the same transactions as Plaintiffs' federal claims, such that they are part of the same case or controversy.

28.     Venue is proper in this District pursuant to 28 U.S.C. §§ 90 and 1391(b) and Local Rule 3.1(B) because events and omissions giving rise to the claims have occurred in this District. Defendant is a municipal corporation that resides in this State, District, and Division.

## PARTIES

29.   **Plaintiff Georgia State Conference of the NAACP** ("Georgia NAACP") is a non-partisan, interracial, nonprofit membership organization founded in 1941, headquartered in Atlanta, Georgia. It has approximately 10,000 members. The mission of the Georgia NAACP is to ensure the political, educational, social, and economic equality of all persons, particularly African Americans, and to eliminate race-based discrimination. It advances this mission through a variety of means, including by providing public education regarding the adverse effects of race discrimination, advocating for its elimination, and seeking the enforcement of federal, state, and local laws securing civil rights. The Georgia NAACP has members who live in LaGrange and who have been harmed by the Court Debt Policy.

30.   **Plaintiff Troup County Branch of the NAACP** ("Troup County NAACP") is a local chapter of the Georgia Conference of the NAACP based in LaGrange, Georgia, and encompassing Troup County. Troup County NAACP's mission is to ensure the political, educational, social, and economic equality of all persons, particularly African Americans, and to eliminate race-based discrimination. In furtherance of this mission, it advocates for quality, affordable housing for all

10

county residents. The Troup County NAACP has members who live in LaGrange and have been harmed by the Court Debt Policy.

31.     **Plaintiff Project South** is a leadership development organization that seeks to increase public education and engagement in areas including racial equity and immigrants' rights. Headquartered in Atlanta, Project South advances its mission through education, leadership development in local communities, grassroots organizing, and advocacy. Project South has members in LaGrange who have been harmed by the Immigrant Utilities Policy.

32.     **Plaintiff the Estate of Charles Brewer** brings a claim on behalf of Mr. Brewer, a since deceased 56-year-old, indigent, African American man who resided in LaGrange, Georgia prior to his death. Mr. Brewer suffered from congestive heart failure and severe sleep apnea, both of which rendered him disabled. In 2014, Mr. Brewer pleaded *nolo contendere* to driving without a license in the LaGrange Municipal Court. The municipal court imposed a fine and placed him on probation for one year, but Mr. Brewer was unable to pay all court debts related to his criminal case at the end of his probation sentence. Two years later, the City's Collection Department attached the court debt stemming from this conviction to Mr. Brewer's utility account, and, in conjunction with the Utilities Department, threatened Mr. Brewer multiple times—in writing, in person, and via telephone—with imminent

utility service disconnection if he did not satisfy the unpaid court debt. Mr. Brewer would not have been able to continue living in his LaGrange home if his utilities were disconnected.

33. **Plaintiff Calvin Moreland** is a 38-year-old, indigent, African American man who resided in LaGrange, Georgia, until November 2019. In January 2017, the City attached fines stemming from a twelve-year-old shoplifting conviction in LaGrange Municipal Court to Mr. Moreland's utility account. The City's Utilities and Collection Departments subsequently sent Mr. Moreland written threats of utility service disconnection if he did not satisfy the unpaid court debt. The impact of living under a state of threat and coercion from Defendant's Policy, in part, led Mr. Moreland to move away from LaGrange. He now resides in Fairburn, Georgia and will not return while the Policy is in effect.

34. **Plaintiff April Walton** is a 39-year-old, indigent, African American woman who resides in LaGrange, Georgia. Ms. Walton is a single mother of three children, ages 15, 17, and 21. Until 2017, she was also the sole caretaker for her disabled mother. In 2015, Ms. Walton pled *nolo contendere* to possession of less than ounce of marijuana in LaGrange Municipal Court. The following year, the City attached court debt stemming from this conviction to Ms. Walton's utility account and threatened to cut off her utilities if she did not satisfy the unpaid court debt.

12

Because she is indigent, she faced a concrete and imminent threat of future utility service disconnection due to the court debt, a portion of which she had to pay with each monthly utility bill to continue receiving services. In February 2017, the City disconnected Ms. Walton's utilities for three days, due in part to the Court Debt Policy. Later in 2017, the City disconnected Ms. Walton's utilities a second time, forcing Ms. Walton, her mother, and her children to leave their home. Upon information and belief, court debt remains attached to Ms. Walton's utility account which she is unable to pay. Ms. Walton would like to seek her own home or apartment but Defendant's Policy prevents her from doing so.

35. **Plaintiff Pamela Williams** is a 48-year-old, African American woman who resides in LaGrange, Georgia. She also owns several single-family homes that she leases to LaGrange residents, some of whom are or have been affected by the Court Debt Policy. Due to the City's Court Debt Policy, Ms. Williams has suffered financial loss because tenants with court debt attached to their utility accounts have missed rent payments to avoid losing essential water, gas, and electricity services. She also suffers from ongoing emotional distress based on her fear and anxiety that the City's enforcement of its racially discriminatory Court Debt Policy will force her to evict tenants whom she would like to house. Ms. Williams is a member of the Troup County NAACP.

36.    **Plaintiff John Doe #1** is a Latino immigrant who has lived in LaGrange for more than fifteen years. Mr. Doe #1 lives with one of his two children in a home that he rents. Because of the City's Immigrant Utilities Policy, Mr. Doe #1 cannot obtain basic utilities from the City of LaGrange in his own name because he has neither an SSN nor a photo identification issued by the United States or a state government. Mr. Doe #1 and his family require basic utilities in order to live in the home they rent.

37.    **Plaintiff John Doe #2** is a Latino immigrant who has lived in LaGrange for more than fifteen years. Mr. Doe #2 lives with his four children in a home that he rents. Because of the City's Immigrant Utilities Policy, Mr. Doe #2 cannot obtain basic utilities from the City of LaGrange in his own name because he has neither an SSN nor a photo identification issued by the United States or a state government. Mr. Doe #2 and his family require basic utilities in order to live in the home they rent.

38.    **Plaintiff John Doe #3** lives in LaGrange with his wife and their two young children in a home that they own. Mr. Doe #3 and his wife are Latino immigrants. Because of the City's Immigrant Utilities Policy, Mr. Doe #3 cannot obtain utilities from the City of LaGrange in his own name because he has neither an SSN nor a photo identification issued by the United States or a state government.

14

His wife is similarly unable to obtain utilities under the Immigrant Utilities Policy. Mr. Doe #3 and his family require basic utilities in order to live in the home they own.

39.    **Defendant City of LaGrange, Georgia**, is a municipal corporation organized under the laws of the State of Georgia and is a political subdivision of the State. Upon information and belief, the City is the sole provider of municipal utilities services to its residents.

40.    The City purchases the electricity to which it restricts access from the Municipal Electric Authority of Georgia ("MEAG"), a public, nonprofit corporation chartered by the State of Georgia with its principal place of business and legal residence in Fulton County. O.C.G.A. § 46-3-112.

41.    LaGrange is a member of MEAG (and therefore has an ownership interest in its assets), and the City's Director of Utilities, Patrick Bowie, sits on MEAG's nine-member board of directors, which meets monthly at MEAG's Atlanta office.

## FACTUAL ALLEGATIONS

### A. The City's Population and Its Provision of Utility Services

42.    The City of LaGrange is a municipality with approximately 30,000 residents. It is the county seat of Troup County.

43.     According to 2011-2015 American Community Survey ("ACS") data from the U.S. Census Bureau, the population of LaGrange was approximately 40% white non-Hispanic, 49% Black non-Hispanic, and 7% Hispanic of any race.

44.     According to the same 2011-2015 ACS data, the population of Troup County, which entirely encompasses LaGrange, was approximately 58% white non-Hispanic, 34% Black non-Hispanic, and 4% Hispanic of any race.

45.     The same 2011-2015 ACS data show that the foreign-born, non-citizen populations of LaGrange and of Troup County have been approximately 68% and 63%, respectively, Latino.

46.     Because LaGrange is the sole provider of essential municipal utilities to its residents, LaGrange residents either receive utility services from the City or they do not receive utility services at all. Individuals and families who cannot obtain utilities are unable to live in LaGrange, and individuals and families who have their utilities terminated are forced to leave LaGrange.

47.     LaGrange does not levy property taxes. Instead, the City funds a substantial portion of its municipal operations with revenues from its provision of utilities, including water, electricity, gas, and other essential services. In fiscal year 2015, the City generated more than $17 million in profit selling utility services.

48.     As described next, the City exploits its market position as the sole provider of utility services to municipal residents through policies and practices that adversely impact African Americans and Latinos.

**B. Court Debt Policy**

49.     LaGrange conditions individuals' ability to receive utilities on their satisfaction of all debts owed the City, including unpaid fees and fines assessed by the LaGrange Municipal Court that are unrelated to utility service. The City's Probation, Collection, and Utilities Departments jointly implement and enforce the Court Debt Policy.

### i. *The LaGrange Municipal Court generates court debt in misdemeanor, traffic-offense, and ordinance-violation cases*

50.     The LaGrange Municipal Court has jurisdiction to hear violations of municipal ordinances; state and local traffic laws that occur within city limits; and some state misdemeanor offenses that occur within city limits.

51.     Although many indigent people in the LaGrange Municipal Court are entitled to a court-appointed attorney, few have them, at least in part because the City charges a $50 fee to obtain a copy of the public defender application.

52.     In many cases, people plead guilty or *nolo contendere* and the LaGrange Municipal Court punishes them with fines, fees, and surcharges.

53.   As a matter of state law, fines imposed by the LaGrange Municipal Court as part of a sentence constitute a judgment in favor of the City. O.C.G.A. § 17-10-20(a).

54.   These judgments accrue interest at the prime rate set by the Federal Reserve, plus three percentage points. O.C.G.A. § 7-4-12(a).

55.   Under the City Code, people who are assessed fines are also required to pay an administrative fee and court costs for each individual offense, payable to the city treasury. LaGrange Mun. Code §§ 5-20-7 (administrative fee), 5-20-17 (court costs). These fees and costs typically increase the total amount assessed for each offense by 30 to 60 percent of the original fine.

56.   People who are unable to pay the fines, fees, and costs (hereinafter referred to collectively as "court debt") on or before the day of court are typically placed on probation for a period of time, usually measured in months.

57.   Probation is administered by the City's Probation Department. The Probation Department charges people who are unable to pay their fines immediately an additional $44 monthly "supervision fee," while they pay their fines over time.

58.   If an individual reaches the end of the sentenced probationary period and still has court debt, the Probation Department refers the case to the LaGrange Collection Department.

> ### ii. When a person is unable to pay the court debt, the City's Collection Department attaches the debt to the person's existing or future utility account

59.     The Collection Department prepares and obtains from the Municipal Court of LaGrange a writ of *fieri facias*—commonly referred to as a "FiFa"—in the amount of the unpaid court debt. A FiFa is a writ of execution, and is a common-law means of enforcing payment on a civil judgment.

60.     The ordinary procedure for executing a civil judgment after a FiFa is obtained is through levy, foreclosure, garnishment, or other action provided for the enforcement of judgments in the State of Georgia and in other states and foreign nations where such judgment is afforded full faith and credit. O.C.G.A. § 17-10-20(c).

61.     In the case of LaGrange, however, once the City has obtained a FiFa, it cross-references the judgment debtor's SSN with those of its utility customers.

62.     If the judgment debtor's SSN matches that of a current utility customer, the City adds the amount of the FiFa to the judgment debtor's utility account. The Collection Department then sends the utility account holder a letter threatening to terminate utility service if the unpaid court debt is not paid.

63.     If the judgment debtor does not have a utility account with the City, the Collection Department flags his or her SSN in the computer system so that if the

debtor later opens a utility account, the City can add the unpaid court debt to it. The City's policy does not provide any statute of limitations for the City to attach court debt to utility accounts.

### iii. The Utility Department conditions utility access on the payment of court debt and threatens to terminate utilities without warning for nonpayment

64.    LaGrange's policy and practice of conditioning access to utilities on the payment of unrelated court debt is codified in an ordinance titled "Payment of unpaid bills and debts, service termination." LaGrange Mun. Code § 20-1-7(h). Enacted by the LaGrange City Council in 2004, this ordinance states:

> Any applicant for utility service who owes an unpaid utility bill or other debt to the city, including but not limited to court judgments and fines, shall pay such unpaid bill or debt prior to obtaining utility service. Additionally, customers who owe debts to the city of any type shall be subject to having utility services terminated for failure to pay said debts without any prior notice from the city.

LaGrange Mun. Code § 20-1-7(h).

65.    Notwithstanding the ordinance language suggesting that individuals are not permitted to obtain utilities services if they owe court debt, the City has permitted individuals who owe court debt to open utility accounts. But once the individual has opened the utilities account and paid the City a security deposit (often totaling hundreds of dollars), the Utilities Department adds the court debt to the individual's monthly utilities bill. The Utilities Department then sends a letter

threatening to terminate all utilities unless the entire bill amount (court debt plus any monthly utilities usage) is immediately paid or the individual signs a payment arrangement with the Collection Department agreeing to add fine payment installments to subsequent utility invoices. *See* Ex. A.

66.     In violation of LaGrange residents' right to receive essential utilities for a reasonable fee and without illegal pre-conditions for service, the Utilities Department unlawfully conditions receipt of these services on the applicant's acknowledgment that:

- "Applicant will pay all applicable utility charges and fees for service at the above location and any other debt owed to the City including court judgments and fines shall be paid prior to obtaining utility services";

- "Any debt owed to the City of LaGrange including but not limited to court judgments and fines shall be paid prior to obtaining utility service";

- "Applicants with delinquent amounts owed to the City of any type shall be subject to having utility services terminated for failure to pay said debts";

- "Penalties may be charged for late payment and service will be discontinued for failure to pay all charges by the due date shown on monthly statements";

- All information provided on the form "is true and correct to the best of my knowledge," which is accompanied by a reminder that, "City Code Section 20-1-11 states that it is unlawful for any person to obtain or attempt to obtain utility service by deceitful means or artful

> practice which includes providing false information during the application process."

*See* Ex. B.

67.    Conditioning access to utilities on the payment of court debt enables the City to require payment of that debt in circumstances under which debtors would otherwise be protected from coercion by creditors.

68.    For example, federal law protects Social Security, Supplemental Security Income ("SSI"), or Social Security Disability Income from being garnished, levied, or otherwise collected to satisfy unpaid municipal court debt. *See* 42 U.S.C. §§ 407(a), 1383(d). These exemptions from garnishment are recognized by the Georgia Attorney General pursuant to O.C.G.A. § 18-4-6(b). Georgia's detailed statutory scheme similarly protects certain benefits from garnishment, limits the amount of earnings that can be garnished, and provides robust procedural protections. O.C.G.A. §§ 18-4-2, 18-4-5, 18-4-6, 18-4-15, 18-4-53, 18-4-82, 34-8-252.

69.     These laws protect low-income people, the elderly, and people with disabilities from losing the public benefits and wages they rely on to survive.

70.    The sole source of income for many individuals affected by the Court Debt Policy, including Mr. Charles Brewer, is or has been Social Security, Supplemental Security Income, or Social Security Disability Income.

71.    LaGrange's collection scheme, however, circumvents these protection schemes by attaching debt to essential utilities to force people like Mr. Brewer to surrender otherwise-protected income to pay unrelated court debt. In Mr. Brewer's case, in order to provide electricity to power medical equipment he needed to breathe. LaGrange could collect court debt by executing these civil judgments using the garnishment proceedings prescribed under Georgia law. O.C.G.A. § 18-4-2. Instead, through the Court Debt Policy, LaGrange effectively strips its low-income residents of the procedural and substantive protections that state and federal garnishment laws afford other debtors including, but not limited to, private debtors with delinquent credit card debt and child support debtors.

72.    The Court Debt Policy also prevents indigent people from accessing other public benefits to which they are entitled. The Housing Authority of LaGrange, for example, requires applicants wishing to reside in one of its four hundred and twenty subsidized housing units to provide written proof from the Utilities Department that they do not owe the City any debts that would be added to their utility account.[1] In other words, indigent individuals with court debt cannot lease public housing in LaGrange, even if they otherwise qualify for it.

---

[1] Housing Authority of the City of LaGrange, Utility Verification, *available at* http://www.phalagrange.net/wp-content/uploads/2014/03/Utility_Verification_Form.pdf (last visited Jan. 6, 2020).

73.    Current public housing tenants are similarly subject to eviction when the City applies its Court Debt Policy by disconnecting utility services, because the disconnection of utilities—even if due to court debt—is a breach of Housing Authority's rental agreement.

74.    From fiscal years 2006 through 2015, the City annually collected approximately $1.65 million in fines and forfeitures through its municipal court.

75.    The City applies the Court Debt Policy, including by threatening utility disconnections, regardless of the nature or age of the underlying municipal court conviction. In recent years, the City has added to existing utility accounts unpaid court debt arising from convictions for, *inter alia*, driving without headlights; driving without a seatbelt; driving without or on a suspended license; driving with an expired tag; failure to yield; failure to stop at a stop light; driving under the influence; driving without insurance; shoplifting; loitering; failure to appear; playing a radio too loudly; cursing in public; walking in the street; having an open liquor container; and possession of an ounce or less of marijuana. Several of these convictions were more than ten years old when the City added the unpaid fines arising from them to customers' utility accounts. The amounts added ranged from less than $200 to more than $4,000. These amounts increase as interest accrues on the underlying fines, fees, and surcharges.

### iv. The Court Debt Policy has a disparate impact on African Americans

76.     African Americans are disproportionately harmed by LaGrange's Court Debt Policy. From January 2015 through September 2016, approximately 90% of individuals threatened with utilities disconnection due to court debt added to their utility accounts were African American, although African Americans make up only 49% of the City's population and 34% of the County's population.

77.     The Court Debt Policy is not necessary to achieve any substantial, legitimate, nondiscriminatory interest of the City.

78.     The stated goal in Section 20-1-7 of the Code of Ordinances, to "reduc[e] potential bad debt of the city resulting from poor credit," does not justify the Court Debt Policy's discriminatory effect. Every provider of utilities in the country, whether private or municipal, shares that interest, yet Plaintiffs are aware of no other one that pursues that interest by conditioning access to water, electricity, and gas on the payment of unrelated court debt.

79.     Mayor Thornton has publicly defended the Court Debt Policy as an alternative to jailing people who have court debt. Jailing indigent debtors who are unable to pay court debt is unconstitutional. *See Bearden v. Georgia*, 461 U.S. 660, 666-67 (1983); *Tate v. Short*, 401 U.S. 395, 398 (1971). Mayor Thornton's statement that the Court Debt Policy makes it possible for the City to not engage in the

unlawful practice of jailing indigent debtors is not a legally sufficient defense of the Court Debt Policy.

80.     The City could achieve any legitimate interest in collecting court debt through other means commonly used by other municipalities, such as garnishment, levy, or accepting credit card payments.

81.     LaGrange has had notice of the disparate impact of the Court Debt Policy on African American people. A February 26, 2016 publication in the *LaGrange Daily News* showed that the application of the Court Debt Policy is concentrated in areas of the City that are predominantly African American and not in areas that are predominantly white.[2]

82.     In the following map from the February 26, 2016 *LaGrange Daily News* article, each blue dot represents a home where court debt was attached to the utility account between January 1, 2013 and February 26, 2016. The overlaid colored zones reflect the racial makeup of the City as determined by the 2010 U.S. Census. The green zones have higher concentrations of white residents, while the red, orange, and yellow zones are predominantly African American.

---

[2] *See* Tyler H. Jones, "NAACP, residents call for end to city's fine collection process," *LaGrange Daily News*, Feb. 26, 2016, *available at* http://www.lagrangenews.com/2016/02/26/naacp-residents-call-for-end-to-citys-fine-collection-process/ (last visited February 3, 2020).



83.    Plaintiffs Georgia NAACP and Troup County NAACP have held town hall meetings in LaGrange addressing the Court Debt Policy. At least one of these meetings was covered in the *LaGrange Daily News*. Plaintiffs Georgia NAACP and Troup County NAACP have furthermore engaged in advocacy with City officials

regarding its deleterious effects. The City has nonetheless continued to implement the Court Debt Policy.

84.    Mayor Thornton has also claimed publicly that no one is denied utilities or has their utilities disconnected because of court debt, but that claim is untrue. As alleged below, Plaintiff Walton had her utilities disconnected twice, and Plaintiffs are aware of other LaGrange residents whose utilities have been disconnected in part because of the Court Debt Policy.

85.    Moreover, the Mayor's claim that the City does not disconnect utility services because of court debt is undermined by three documents that expressly threaten service disconnection on that basis alone: (1) LaGrange Municipal Ordinance § 20-1-7(h), (2) the City's notice letter informing residents of court debt added to their utility accounts (Ex. A), and (3) the City's utility application (Ex. B).

## C. Immigrant Utilities Policy

### i.    *The City has required utility account holders to provide an SSN and photo identification issued by a state or federal entity*

86.    As a further condition of obtaining a utilities account, the City has required that an individual produce *both* a Social Security Number ("SSN") *and* one of the following forms of photo identification:

> a.  An unexpired driver's license or photo identification issued by a state government;

b. An unexpired Georgia Voter ID card;

c. An unexpired U.S. military identification;

d. An unexpired U.S. passport; or

e. An unexpired Permanent Resident Card (commonly known as a "green card") issued by the U.S. government.

87.    These two requirements have been part of a single policy adopted by the LaGrange City Council in 2008, and are hereinafter referred to as the "Immigrant Utilities Policy." Since the original Complaint in this case was filed, the City has stated that it no longer requires provision of an SSN from applicants for utilities. The online application for new utility service, available at https://harris.lagrange-ga.org/moving/i_move_new.asp, continues to ask applicants for their SSN and states that applicants who do not provide an SSN will be charged the maximum deposit.

88.    Pursuant to its Immigrant Utilities Policy, the City continues to require unexpired photo identification documents that are issued by a state or federal government entity in the United States.

89.    As the City is aware, many non-citizens, including people lawfully present, are ineligible to obtain SSNs because they do not meet Social Security Administration requirements to obtain one. Lawfully present non-citizens who are not work-authorized—such as a foreign-students at LaGrange College or individuals

in more than 50 other visa categories, as well as many asylum applicants and innumerable others—are categorically ineligible for SSNs.

90.     On the other hand, many non-citizens in this country who cannot obtain SSNs, including both undocumented and many lawfully present individuals, *are* eligible to obtain Individual Tax Identification Numbers ("ITINs"), which are issued by the Internal Revenue Service ("IRS"). Like SSNs, ITINs are nine-digit numbers that individuals can use to pay income taxes.

91.     To obtain an ITIN, individuals must prove their identity to the IRS.

92.     The City uses an applicant's SSN when determining an applicant's credit score. ITINs, like SSNs, can also be used to verify identity and creditworthiness. Indeed, ITINs are accepted by utility companies across the State and country for precisely these purposes.

93.     Yet, pursuant to the City's Immigrant Utilities Policy, employees of the City's Utility Department refuse to accept an ITIN in lieu of an SSN. Indeed, the City's policy specifies that no number can be accepted to satisfy the SSN requirement if the first three digits are above 740. All ITINs begin with the number 9, and therefore do not meet this requirement. As a result, the City does not determine the credit score of utility applicants who do not provide an SSN even

though ITINs can be used to determine creditworthiness. These individuals are instead charged the maximum deposit.

94.     Many non-citizens, including both lawfully present and undocumented individuals, are ineligible for and/or do not possess any of the other identity documents that the City will accept to fulfill the photo identification requirement pursuant to its Immigrant Utilities Policy. The City of LaGrange is aware of this fact.

95.     Many categories of individuals who do not possess the forms of photo identification required by the City also lack an SSN. These individuals continue to be unable to access utilities due to the City's photo identification requirement even if they can now proceed without an SSN.

96.     Not only does the City deny utilities to people who lack the types of identification documentation required by the Immigrant Utilities Policy, but it prohibits third parties from opening utility accounts on behalf of individuals who cannot themselves meet the requirements of the Immigrant Utilities Policy.

97.     The City does not permit individuals to open or maintain a utility account for a property that they do not own or lease, and it provides for the imposition of a fine of up to $1,000 and/or a sentence of either imprisonment or hard labor of up to six months for anyone who provides false information during the application process. LaGrange Mun. Code. §§ 20-1-11, 1-1-6.

31

98.     As a practical matter, individuals who wish to live in LaGrange, but cannot meet the City's Immigrant Utilities Policy, have four options:

    a.  First, they can rent from a landlord who is willing to put the utilities in his or her name. Many individuals in LaGrange choose this option, but it severely limits the housing available to them, and often results in having to accept housing that is substandard, in less desirable neighborhoods, and/or more expensive. It can also complicate school enrollment by making it more difficult to prove in-district residency and, unlike having the account in one's own name, eliminates a way for an individual to establish a record of creditworthiness. This option also requires sacrificing a level of privacy and independence, as the tenant is dependent on the landlord for the timely payment of bills, which can make tenants vulnerable to exploitation, and the tenant is less able to seek redress for problems with the utilities.

    b.   Second, they can find a third party who is willing to put the utility account in his or her name. Many individuals in LaGrange choose this option as well, but it puts both the tenant

and the named accountholder at risk of prosecution under LaGrange Municipal Code § 20-1-11. It shares many of the drawbacks of the first option, including sacrificing privacy, independence, security, the opportunity to build credit, and the ability to seek help when utility problems arise.

c.  Third, they can simply go without utilities at their home. For most people, and for a variety of reasons—central among them health—this option is not viable. However, Plaintiffs are aware that individuals desperate for housing in LaGrange have lived without utilities, including for extended periods, because they are ineligible to receive them under the Immigrant Utilities Policy.

d.  Fourth, individuals who are unable to place utilities in their own name may live with a relative, friend, or acquaintance who can satisfy the Immigrant Utilities Policy. This leads to overcrowded and substandard living conditions, and limits their housing options.

### ii.   The City's Immigrant Utilities Policy has a disparate impact on Latinos

99.   LaGrange's Immigrant Utilities Policy disproportionately harms Latinos who reside or seek to reside in LaGrange.

100.   LaGrange's Immigrant Utilities Policy has a severe impact on undocumented immigrants, who are categorically unable to meet its requirements.

101.   Approximately three-quarters of all undocumented immigrants residing in Georgia are Latino.

102.   LaGrange's foreign-born population is disproportionately Latino.

103.   Upon information and belief, the demographics of the population of undocumented immigrants in and around LaGrange mirrors the demographics of the undocumented population throughout Georgia and is overwhelmingly Latino.

104.   LaGrange lacks any legally sufficient justification for implementing the Immigrant Utilities Policy despite its clear disproportionate impact on Latinos. It cannot legitimately claim that the Policy furthers a non-discriminatory interest in ensuring the identity and credit of its account holders because it also refuses to allow individuals who *do* meet the identification documentation requirements to open accounts on behalf of others.

105.   Over the last several years, the City of LaGrange has given at least three additional justifications for its Immigrant Utilities Policy, each of which are equally insufficient to justify the Policy's discriminatory impact on Latinos.

106.   First, at least as recently as 2010, the City claimed that its Immigrant Utilities Policy is required by the federal USA PATRIOT Act, enacted in October 2001.

107.   That claim was false, as the USA PATRIOT Act has never contained any requirement regarding either SSNs or photo identification for the provision of utilities or municipal services.

108.   Second, since at least 2008 and continuing to this day, the City has sought to justify the Immigrant Utilities Policy by claiming that it is mandated or otherwise required by the federal Fair and Accurate Credit Transactions Act ("FACTA"), enacted in 2003 as an amendment to the Fair Credit Reporting Act.

109.   However, although FACTA requires creditors to take reasonable steps to prevent identity theft, it does not mandate or otherwise require creditors to take any specific actions. It does not require a creditor to demand an SSN as a condition of providing credit, nor does it limit the types of identification documents a creditor may accept to ones issued by the United States or the government of a state.

110.   Indeed, utility providers across the State and country, including municipal utility providers, routinely permit individuals who do not have an SSN and cannot provide a form of identification that LaGrange demands to open utility accounts.

111.   Third and finally, since at least 2008 and through the filing of the original Complaint in this matter, the City claimed that its requirement of an SSN for utility services was pursuant to the federal Privacy Act of 1974.

112.   The Privacy Act in fact *prohibits* the conditioning of access to municipal services on individuals producing an SSN, save for limited exceptions that do not apply here.

113.   Any legitimate interest the City has in verifying the identity and credit of its utilities customers could be served through other, less discriminatory means. For example, the City could join other Georgia municipalities and private companies like Georgia Power and accept ITINs and government-issued photo identification documents issued by foreign governments.

## **INJURIES TO PLAINTIFFS**

114.   The City's patterns, policies, and practices of discrimination as described herein constitute a continuing violation of the United States Constitution, federal civil rights laws, and Georgia law.

**A. Harm to Organizational Plaintiffs**

115.   Defendant's enforcement of the Court Debt Policy has harmed and will continue to harm Plaintiffs Georgia NAACP, Troup County NAACP, Project South, and their members. All three are membership organizations with standing to sue for injunctive and declaratory relief on behalf of their members.

116.   Plaintiffs Georgia NAACP and Troup County NAACP have individual members who live and/or seek to live in LaGrange and have been harmed by LaGrange's Court Debt Policy. At least one member is a landlord who has suffered lost rental income because her tenants have had their utility services disconnected. Upon information and belief, other members have suffered or will suffer similar harms.

117.   Members of Plaintiffs Georgia NAACP and Troup County NAACP will continue to be injured if LaGrange is permitted to continue enforcing its discriminatory Court Debt Policy.

118.   Through this action, Plaintiffs Georgia NAACP and Troup County NAACP seek to combat a discriminatory and unlawful practice that undermines the ability of their members and other African Americans in LaGrange to obtain and maintain stable, habitable housing. This goal is germane to the Georgia NAACP and Troup County NAACP's shared organizational mission of combatting racial

discrimination and promoting the political, educational, social, and economic equality of all persons.

119.   The participation of individual members of Plaintiffs Georgia NAACP and Troup County NAACP is not necessary for purposes of their claims for injunctive and declaratory relief because the injunctive and declaratory relief sought is broadly applicable and not specific to the circumstances of any individual member.

120.   Defendant's enforcement of the Court Debt Policy has furthermore harmed and will continue to harm Plaintiff Georgia NAACP as an organization, and Georgia NAACP therefore has standing to sue in its own right for damages and equitable relief.

121.   Defendant's enforcement of its Court Debt Policy has frustrated and will continue to frustrate Plaintiff Georgia NAACP's mission of eliminating race-based discrimination and promoting political, educational, social, and economic equality.

122.   Georgia NAACP has expended considerable staff time and resources as a result of Defendant's discriminatory conduct. Georgia NAACP has conducted research, education, and outreach to determine the nature of Defendant LaGrange's Court Debt Policy and the extent of the harm it has caused in the African American

community in LaGrange. Georgia NAACP has also expended resources in attempting to counteract that harm. Examples of these activities include:

    a. Hosting community-wide town hall meetings to educate community members regarding the policy, solicit information from those affected, and advocate for policy changes before City officials.

    b. Traveling to LaGrange to meet with City officials regarding the Court Fine Policy and to attend recurring strategic planning meetings with the Troup County NAACP, incurring travel expenses and the loss of staff time that would otherwise be devoted to other efforts.

    c. Engaging in advocacy efforts directed at LaGrange officials on behalf of community members impacted directly by the Policy.

    d. Conducting research, launching an education campaign regarding unfair collection of probation fees and fines, and developing an educational website featuring the issues encountered in LaGrange.

123.   Because of the need to engage in these activities, Plaintiff Georgia NAACP has diverted and will continue to divert resources away from other planned

programs and activities central to its mission, including registering and educating voters, conducting voter outreach, and conducting educational outreach regarding economic empowerment and financial literacy.

124.   Georgia NAACP's past and ongoing efforts to counteract LaGrange's discriminatory policies have prevented and delayed and will continue to prevent and delay other planned projects that it would otherwise pursue. For example, Georgia NAACP's diversion of staff time spent combatting LaGrange's discriminatory utility policy through advocacy and outreach has resulted in delays in grant reporting and planning and executing quarterly meetings.

125.   Plaintiff Georgia NAACP has furthermore suffered frustration to its mission because LaGrange's discriminatory policies make it difficult or impossible for a group of people who are disproportionately African American to obtain vital municipal utilities and undermines this Plaintiff's mission of eliminating race-based discrimination and promoting political, educational, social, and economic equality in communities throughout the State of Georgia.

126.   Plaintiff Project South is a membership organization based in Atlanta, Georgia, and with members throughout the South.

127.   Project South has individual members who have been harmed by LaGrange's Immigrant Utilities Policy. For example, members have been unable to

open utility accounts in their own names because they lack an SSN and a photo identification acceptable to the City, which has limited their housing options, deprived them of utility services, and/or forced them to risk prosecution in order to obtain essential utilities.

128.   Members of Project South will continue to be injured in the future if LaGrange is permitted to continue enforcing its discriminatory Immigrant Utilities Policy.

129.   The interests that Project South seeks to protect through this action are germane to its organizational purposes of combatting racial discrimination and promoting the social and civil rights of immigrants.

130.   The participation of individual members of Project South in this litigation is not necessary for purposes of Project South's claims for equitable relief because the injunctive and declaratory relief sought is broadly applicable and not specific to the circumstances of any individual member.

**B. Harm to Individual Plaintiffs**

131.   As a result of the City's unlawful conduct, the individual Plaintiffs have suffered fear, humiliation, embarrassment, emotional distress, and unlawful deprivation of their federally protected rights.

132.   As a result of the City's unlawful actions, the individual Plaintiffs have suffered continuing economic damages, including but not limited to out-of-pocket and other expenses.

### i.   *Plaintiff Charles Brewer*

133.   Mr. Brewer was a 56-year-old disabled man who suffered from congestive heart failure and severe sleep apnea. These conditions required uninterrupted electricity access to power his oxygen tank and CPAP machine.

134.   Mr. Brewer was unable to work, and his income consisted entirely of $1,100 in monthly SSI benefits.

135.   In October 2014, Mr. Brewer pleaded *nolo contendere* to driving without a license in LaGrange Municipal Court.

136.   The LaGrange Municipal Court placed Mr. Brewer on probation with the City's probation department for 12 months, and ordered him to pay $600 in fines, $227 in court costs and surcharges, and $44 in monthly probation supervision fees.

137.   Mr. Brewer ended his probation sentence with $210.25 in outstanding court debt. The City's probation department transferred this balance to the City's Collection Department on or around October 15, 2015.

138.   On November 18, 2015, the City's Collection Department sought a FiFa in the amount of $210.25, plus an additional $22.52 in interest, against Mr.

Brewer in the LaGrange Municipal Court. On the same date, the presiding Municipal Court judge signed a $232.77 FiFa against Mr. Brewer.

139.   On November 30, 2015, the Collection Department recorded the FiFa in the Troup County Superior Court.

140.   On March 7, 2016, Mr. Brewer applied to the City's Utility Department for utility services for his new home. The Utility Department required that Mr. Brewer acknowledge the following terms contained in the utility application:

> 2. Applicant will pay . . . any debt owed to the City including court judgements and fines . . . 7. Any debt owed to the City of LaGrange including but not limited to court judgements and fines shall be paid prior to obtaining utility service . . . 8. Applicants with delinquent amounts owed to the City of any type shall be subject to having utility services terminated for failure to pay said debts.

141.   With no choice other than to sign the form, Mr. Brewer did so, and the Utilities Department approved Mr. Brewer's application, required a $500 deposit, and began providing utility services.

142.   Five months later, the Collection Department sent Mr. Brewer a letter informing him that the $232.77 court debt balance "ha[d] been added to [his] current City of LaGrange utility account per City Ordinance (20-1-7h). In order to avoid interruption of service, [his] utility account must not have an arrears and [he] must contact the Collection Department . . . to make arrangements to pay the above fines."

143.   After receiving this letter, Mr. Brewer notified employees in the City's Utility and Collection Departments of his health problems and reliance on his electrically powered oxygen tank and CPAP machine. On September 28, 2016, the Utilities Department added a "medical no-cut" notation to Mr. Brewer's utility account that purportedly exempted Mr. Brewer from service disconnection because of his serious medical needs.

144.   Despite this notation, the City's Utility and Collection Departments told Mr. Brewer on at least four different occasions that he faced imminent utility service disconnection because of utility and court fines debt. On one occasion, the head of the City's Collection Department told Mr. Brewer that the City could disconnect all his utility services and leave him with only enough electricity to power his oxygen tank and CPAP machine.

145.   Mr. Brewer's physician submitted a Medical Exemption Application to the City's Utility Department in December 2016 confirming that Mr. Brewer suffered from "life-threatening" conditions that required utility access to treat. But the City's threats continued, prompting Mr. Brewer to ask a Utility Department employee, Barry Johnson, for another Medical Exemption Application to temporarily protect him from service disconnection in February 2017. Johnson

withheld this utility-saving document for over two weeks until Mr. Brewer paid $190 towards his utility and court debt.

146.   Mr. Brewer submitted the completed Medical Exemption Application on March 3, 2017. The City's Utility Department responded with a letter dated March 3, 2017, approving a sixty-day exemption from service disconnection because disrupted utility access would "aggravate" Mr. Brewer's "heart failure." But in that same letter, the Utility Department again threatened service disconnection:

> We certainly sympathize with the medical problems in your household, however, we have a responsibility to ensure collection of all utility amounts due. Please note that at the end of this extention [sic] period, you must begin paying your current bills in addition to half of the past due amount as required by City Code Section 20-1-8(a) in order to avoid disconnection of your utility services on MAY 3, 2017.

147.   On April 10, 2017, Mr. Brewer made a $200 payment to the Utility Department, but he remained in arrears. He was able to obtain another temporary medical exemption from service disconnection, but the Utilities Department told him he must pay $400 by the end of May 2017 to keep his utilities.

148.   Mr. Brewer would have been at less risk of utility disconnection if he did not have to pay for his court debt as part of his utilities account payments.

149.   Federal law protects SSI income like Mr. Brewer's from garnishment or other legal collection process by creditors seeking repayment of debts. Georgia law explicitly incorporates the same protection. If Mr. Brewer had owed his

45

municipal court debt to a private creditor, instead of the City, it would have been exempt from collection. Instead, the threat of utility disconnection forced Mr. Brewer to repeatedly surrender money to the City for his court debts that he would have otherwise devoted to more critical expenses.

150.   Since the City attached court fines to his utility account in August 2016, Mr. Brewer paid approximately $1,100 to the Utility Department, and received no accounting of the City's allocation of these payments between his court debt and utility-related balance. Undersigned counsel asked the City's Attorney for guidance on the allocation of Mr. Brewer's payments between court debt and utility-related fees, but received no response.

151.   The repeated threats of imminent utility disconnection caused Mr. Brewer to suffer injury, including fear, anxiety, stress, humiliation, and emotional distress. For years, Mr. Brewer faced a concrete and imminent threat of continuing harm due to the City's Court Debt Policy. Mr. Brewer passed away in August 2018, at the age of 56.

### ii.   *Plaintiff Calvin Moreland*

152.   In 2005, Mr. Moreland pled *nolo contendere* to theft by shoplifting and failing to appear at a prior court date in LaGrange Municipal Court.

153.   The Court sentenced Mr. Moreland to 12 months of probation for the shoplifting charge, and ordered him to perform ten days of community service, and to pay $1,000 in fines, $327 in court costs and surcharges, and $44 in monthly probation supervision fees. The Court further sentenced Mr. Moreland to a consecutive six-month probation period for the failure to appear charge, and ordered him to perform an additional three days of community service, and to pay $100 in fines, $62 in costs and surcharges, and $44 in monthly probation supervision fees.

154.   Around December 2006, Mr. Moreland's probation terminated. The City's Probation Department transferred his unpaid fine balance to the City's Collection Department at a 6.25% interest rate.

155.   In January 2007, the City's Collection Department sought a FiFa for $805.60 in LaGrange Municipal Court. The Court signed the FiFa, which was recorded in Troup County Superior Court that same month.

156.   Mr. Moreland sought utility services from the City more than nine years later, on October 17, 2016. The Utility Department required that Mr. Moreland acknowledge the following terms contained in the utility application:

> 2. Applicant will pay . . . any debt owed to the City including court judgements and fines . . . 7. Any debt owed to the City of LaGrange including but not limited to court judgements and fines shall be paid prior to obtaining utility service . . . 8. Applicants with delinquent amounts owed to the City of any type shall be subject to having utility services terminated for failure to pay said debts.

157.   With no choice other than to sign the form, Mr. Moreland did so. The Utilities Department then approved Mr. Moreland's application, required a $500 deposit, and began providing utility services.

158.   The City then sent Mr. Moreland a notice letter, dated October 17, 2016, falsely informing him that the $805.60 court fine balance from 2006 "ha[d] been added to [his] current City of LaGrange utility account per City Ordinance (20-1-7h). In order to avoid interruption of service, [his] utility account must not have an arrears and [he] must contact the Collection Department . . . to make arrangements to pay the above fines."

159.   The City did not, however, add the court debt balance to Mr. Moreland's utility account until January 2017. At that point, Mr. Moreland's utility arrears went from $369.52 (the amount he was behind in utility-related payments) to $1,175.72 (including the $805.60 court debt balance).

160.   In late January 2017, the City sent Mr. Moreland a disconnection notice threatening service interruption on February 6, 2017, if he did not pay $1,175.72 in court debt and utility-related charges.

161.   On February 2, 2017, Mr. Moreland signed a payment arrangement prepared by the Collection Department to satisfy his court debt. Under this

arrangement, Mr. Moreland had to make eight installment payments of $100 over the next eight months, with the installments attached to his monthly utility bill.

162.   The payment arrangement expressly penalized late or missed court fine payments. Documents prepared by the City warned that "[t]he AMOUNT DUE on your utility account must be paid by the 'DUE DATE' each month or your service may be discontinued WITHOUT NOTICE." The document continued, "If you do not comply with the terms of this agreement, the payment arrangements will be cancelled and the REMAINING BALANCE added to your utility account and will be DUE IMMEDIATELY."

163.   With the inclusion of court debt, the monthly payments were almost impossible for Mr. Moreland to pay. Because he is indigent and lives paycheck to paycheck, he was in constant fear of being unable to make a payment and facing imminent utility disconnection, causing him irreparable loss and injury, including fear, anxiety, stress, humiliation, and emotional distress.

164.   Mr. Moreland faced a concrete, ongoing, and imminent threat of utilities disconnection and constructive eviction from his home due to the City's Court Debt Policy. As recently as April 18, 2017, the City threatened to disconnect his utilities as of April 20, 2017, in part because he was unable to make the $100

monthly installment payments towards his court debt while he searched for full-time employment.

165.   Motivated in part by the City's repeated utility disconnection threats, Mr. Moreland moved away from LaGrange in November 2019, and does not plan to return while the Court Debt Policy is in place.

### iii.   *Plaintiff April Walton*

166.   Ms. Walton is a single mother of three children aged 15, 17, and 21. Until 2017, she was also the sole caretaker for her disabled mother, who is unable to live by herself because of a brain surgery and dementia.

167.   On March 14, 2015, Ms. Walton was riding in a car with her sister and her sister's boyfriend when officers with the LaGrange Police Department pulled the car over. During the stop, the police found a small amount of marijuana in the car. The police ticketed everyone in the automobile, including Ms. Walton, for possession of less than an ounce of marijuana. Ms. Walton pleaded *nolo contendere* to this charge in LaGrange Municipal Court on July 14, 2015.

168.   The Court sentenced Ms. Walton to 12 months of probation with the City's Probation Department, and ordered payment of $1,145 in fines, costs, and surcharges, and $44 in monthly probation supervision fees. Despite her best efforts, Ms. Walton was unable to pay her entire court debt before her probation sentence

terminated. Thus, the City's Probation Department transferred $853.60 in court debt to the City's Collection Department at an interest rate of 6.25%.

169.   The City's Collection Department sought a FiFa in LaGrange Municipal Court on July 26, 2016; the Court signed the FiFa the same day, and it was recorded in Troup County Superior Court on August 9, 2016.

170.   Ms. Walton requested utility services at her former home on or around November 24, 2015. She received utility services soon thereafter.

171.   In August 2016, the Collection Department sent Ms. Walton a letter notifying her that $907.79 in court debt "ha[d] been added to [her] current City of LaGrange utility account per City Ordinance (20-1-7h). In order to avoid interruption of service, [her] utility account must not have an arrears and [she] must contact the Collection Department . . . to make arrangements to pay the above fines."

172.   To avoid utility service disruption, Ms. Walton signed a payment arrangement in October 2016 that required her to make ten monthly payments of $90 attached to her monthly utility bills. The payment arrangement warned, "The AMOUNT DUE on your utility account must be paid by the 'DUE DATE' each month or your service may be discontinued WITHOUT NOTICE." The arrangement further provided, "If you do not comply with the terms of this agreement, the

payment arrangements will be cancelled and the REMAINING BALANCE added to your utility account and will be DUE IMMEDIATELY.”

173.   As of February 7, 2017, Ms. Walton had made at least three $90 installment payments towards her court fines.

174.   Despite these payments, Ms. Walton received an automated phone call in mid-February 2017 threatening utility service disconnection if she did not pay her utility invoice, twenty percent of which was court debt. Ms. Walton was unable to pay the amount demanded on the call.

175.   Around February 20, 2017, the City disconnected Ms. Walton’s gas and electricity.

176.   Without utilities, Ms. Walton, her three children, and her disabled mother could not live in their home. Ms. Walton sent her mother to stay temporarily with Ms. Walton’s brother, while Ms. Walton and her three children stayed with her ex-husband.

177.   Leaving their home created additional financial hardships for Ms. Walton and her family. Ms. Walton worked at a hotel, where she received $200-$300 every two weeks for servicing rooms. Forced from her home, Ms. Walton had to pay someone to drive her two youngest children to and from school because there was no bus route near her ex-husband’s home. Ms. Walton also had to pay someone

to drive her to and from work because her ex-husband's home was farther away from her job than her home.

178.   Three days after the disconnection of their electricity and gas, Ms. Walton used her tax refund check to make a lump sum payment to the City's Utilities Department. Her utilities were restored, and Ms. Walton, her children, and her disabled mother returned to their home.

179.   According to City officials, Ms. Walton remained in arrears. She continued to make payments pursuant to the payment arrangement, but, like Mr. Moreland, lives paycheck to paycheck and was never sure she would have an additional $90 each month for the payment plan. Because she knew she might not always be able to make the monthly payment on time, and because the City had already disrupted her utility services and displaced her family, Ms. Walton feared future service disconnections.

180.   Later in 2017, the City disconnected Ms. Walton's gas and electricity a second time.

181.   Ms. Walton, her children, and her disabled mother could not stay in their home without access to gas or electricity. Again, they were forced to leave their home. Ms. Walton and her children returned to living with her ex-husband. They continue to live there.

182.   Upon information and belief, court debt remains attached to Ms. Walton's utility account which she is unable to pay. Ms. Walton is still indigent and living paycheck to paycheck. If Ms. Walton did not have court debt attached to her utility account, she and her children would seek their own home or apartment.

183.   The City's actions have caused Ms. Walton to suffer irreparable loss and injury, including fear, anxiety, stress, humiliation, and emotional distress. Ms. Walton continues to face a concrete and continuing harm due to the City's Court Debt Policy.

### iv.   *Plaintiff Pamela Williams*

184.   Ms. Williams leases several residential rental properties throughout LaGrange. The majority of her tenants are African American and indigent. Several of Ms. Williams's tenants were affected by the Court Debt Policy at the time of the filing of the original complaint and in the months since then.

185.   The City's Collection Department has threatened to disconnect the utility accounts of some of Ms. Williams's African American tenants because of court debt that the City has attached to their utility accounts. As a result, some of Ms. Williams's tenants have been unable to pay their rent on time, or at all, because they have had to use money they otherwise would have used for rent to pay off old court debt.

186.   In the four months prior to filing of the original complaint, Ms. Williams had been deprived of at least $1,200 in rental income from tenants who were unable to pay both their rent and utility invoices because of added court debt.

187.   Ms. Williams continues to suffer a concrete and imminent threat of economic loss and harm as a result of the Court Debt Policy. At the time of the filing of the original complaint, Ms. Williams had at least two tenants who had been unable to pay the court-debt component of their utilities arrears and had been threatened with disconnection, preventing them from paying their full rent to Ms. Williams on time. The same is true of past tenants who rented from Ms. Williams in the two years prior to filing of the original complaint.

188.   In addition to lost income, Ms. Williams has suffered and continues to suffer emotional distress that her tenants will be subject to utility disconnection and that she will have to evict them, which she does not want to do for numerous reasons, including that it would make her complicit in the City's discriminatory policy of conditioning access to utilities on the payment of unrelated court debt.

### v.    *Plaintiff John Doe #1*

189.   John Doe #1 is a Latino immigrant from Mexico who has lived in LaGrange for more than ten years. He currently resides in LaGrange with one of his two children in a home that he rents.

190.   Although Mr. Doe #1 tried to open a utilities account in his name, the City denied him that opportunity because he has neither an SSN nor a form of photo identification that the City will accept under its Immigrant Utilities Policy. Instead, Mr. Doe #1 must obtain utilities in his landlord's name, limiting his housing options.

191.   Mr. Doe #1 has an ITIN that was given to him by the IRS, and for which he had to prove his identity with the IRS.

192.   Mr. Doe #1 has photo identification issued to him by the government of Mexico. The City will not accept this form of identification or his ITIN.

193.   Over the years, the inability to have his utilities in his own name has caused Mr. Doe #1 problems. In particular, it has made it more difficult to prove his own residency, which is imperative for routine aspects of life in LaGrange, such as registering his children for school.

194.   The Immigrant Utilities Policy has forced Mr. Doe #1 to rely on his landlord to make timely payment of the utility bill; forced Mr. Doe #1 to give up his family's privacy regarding their utility usage; and deprives him of an opportunity to build a record of creditworthiness.

195.   Additionally, Mr. Doe #1 feels that the City of LaGrange's refusal to permit him to open a utilities account in his own name is an affront to his dignity, as well as that of other immigrants, who in LaGrange are overwhelmingly Latino.

56

196.   For these reasons, Mr. Doe #1 seeks to have a utilities account in his own name. He is willing to pay for the utilities his household uses and to abide by reasonable, non-discriminatory rules relating thereto.

### vi.   Plaintiff John Doe #2

197.   John Doe #2 is a Latino immigrant from Mexico who has lived in LaGrange for more than ten years. He currently resides in LaGrange with his four children in a home that he rents.

198.   Mr. Doe #2 is unable to obtain utilities in his own name because he does not have an SSN and second form of photo identification that the City will accept under its Immigrant Utilities Policy. Instead, Mr. Doe #2 has needed to have utilities in the name of his landlord.

199.   Mr. Doe #2 has an ITIN that was given to him by the IRS. Mr. Doe #2 had to prove his identity to the IRS to obtain the ITIN.

200.   Mr. Doe #2 has photo identification issued to him by the government of Mexico. Neither this identification nor the ITIN is acceptable to the City.

201.   Mr. Doe #2 would like to maintain a utilities account in his own name, as the inability to do so limits Mr. Doe #2's housing options. For example, Mr. Doe #2 would like to purchase a home in LaGrange, but has not done so because he would not be able to get utility services at any home he purchases in LaGrange.

202.   Mr. Doe #2 fears that he could lose utility services if his landlord sells the home that he rents. His current landlord agreed to put the utilities in his name when he purchased the home from Mr. Doe #2's previous landlord, but the next landlord may be unwilling to do the same.

203.   Mr. Doe #2 would also like to get utilities in his own name so that he can build his credit, so that he and his family have more privacy regarding their monthly usage of public utilities, and so that he does not have to depend on his landlord to pay the utility bill or share information about his utility services with his landlord.

204.   Like Mr. Doe #1, Mr. Doe #2 feels that the City of LaGrange's refusal to permit him to open a utilities account in his own name is discriminatory because the SSN and photo identification requirements primarily impact Latino people.

205.   Mr. Doe #2 is willing to pay for the utilities his household uses and to abide by reasonable, non-discriminatory rules relating thereto.

### vii.   *Plaintiff John Doe #3*

206.   John Doe #3 is a Latino immigrant from Mexico who has lived in LaGrange for more than ten years. He lives with his wife (a Latina immigrant) and their two young children. Mr. Doe #3 owns the home in which he and his family live.

207.   Neither Mr. Doe #3 nor his wife can meet the requirements of the Immigrant Utilities Policy, as neither has an SSN and photo identification deemed acceptable by the City.

208.   Mr. Doe #3 has an ITIN that was given to him by the IRS. Mr. Doe # 3 had to prove his identity to the IRS to obtain an ITIN.

209.   Mr. Doe #3 has photo identification issued to him by the government of Mexico. The City does not accept this identification or the ITIN.

210.   Mr. Doe #3 and his family receive utilities at their home because a friend of the family who could meet the Immigrant Utilities Policy was willing to open an account for them.

211.   To open a utilities account with the City, the applicant must state that she either owns or rents the address where the utilities are being provided. Because the friend who holds the account for Mr. Doe #3's services does not actually own or rent the home, he and Mr. Doe #3 are at risk of prosecution under LaGrange Municipal Ordinance § 20-1-11 ("Theft of utility service by deception"), which makes it unlawful "for any person to obtain or attempt to obtain utility service from the city by deceitful means or artful practice, which shall include, but is not limited to, the obtaining of utility service by providing false information during the application process."

212.   Mr. Doe #3 would like to have utilities in his own name so that both he and his friend can avoid the risk of prosecution. But, since he cannot meet the Immigrant Utilities Policy, and since he does not rent his home (and therefore cannot depend on a landlord for utilities), his current arrangement is the only one through which he and his family can obtain utilities at the home they own.

213.   The Immigrant Utilities Policy also forces Mr. Doe #3 to rely on his friend for payment of the utility bill; forces Mr. Doe #3 to give up his family's privacy regarding their utility usage; and deprives him of an opportunity to build a record of creditworthiness.

214.   Mr. Doe #3 is willing to pay for the utilities his household uses and to abide by reasonable, non-discriminatory rules relating thereto.

### **CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**Fair Housing Act, 42 U.S.C. §§ 3604(a), (b) and § 3617**
***For Injunctive and Declaratory Relief on Behalf of All Plaintiffs***
***For Damages on Behalf of Individual Plaintiffs and Georgia NAACP***

215.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

216.   The Fair Housing Act prohibits making housing unavailable on the basis of, *inter alia,* race, color, or national origin. 42 U.S.C. § 3604(a) (prohibiting

making housing otherwise unavailable on the basis of a characteristic protected under the Act).

217.   The Fair Housing Act prohibits discrimination in the provision of services or facilities relating to the use of a dwelling because of, *inter alia*, race, color, or national origin. 42 U.S.C. § 3604(b) (prohibiting race discrimination in the provision of housing-related services).

218.   The Fair Housing Act prohibits, *inter alia,* acts that interfere with a person's exercise or enjoyment of, or on account of their having exercised or enjoyed their rights under the Act. 42 U.S.C. § 3617 (prohibiting interference with the enjoyment of the right to housing without discrimination).

219.   Under the Fair Housing Act, when a governmental defendant provides housing-related municipal services, particularly where it is the sole provider of municipal services, it must do so in a manner that does not discriminate based on race, color, or national origin.

220.   The Fair Housing Act prohibits not only intentionally discriminatory housing practices but also housing practices that have an unjustified disparate impact on members of a protected group.

221.   As set forth above, including in Paragraphs 32-35 and 50-85, the City has discriminated in the provision of municipal utility services that are essential to

the use and enjoyment of housing—such as electricity, water, and gas—based on race and color, in violation of the Fair Housing Act, by denying and threatening to deny these services to individuals with outstanding debts for court fines and fees that are unrelated to the provision of utilities.

222.   Defendant's application of the Court Debt Policy disproportionately impacts African Americans. The population of individuals who are unable to receive or continue receiving essential municipal utility services from LaGrange based on the application of LaGrange's Court Debt Policy is overwhelmingly African American; Defendant has no legally sufficient justification for denying essential municipal utility services based on an individual's court debt that is unrelated to the provision of utilities; and any legitimate, non-discriminatory interests that Defendant may identify can be achieved through other practices that have a less discriminatory effect.

223.   As set forth above, including in Paragraphs 36-38 and 86-113, Defendant has discriminated in the provision of municipal utility services that are essential to the use and enjoyment of housing—such as electricity, water, and gas— based on race and/or national origin, in violation of the Fair Housing Act, by denying these services to individuals who cannot meet the requirements of its Immigrant Utilities Policy.

224.   Defendant's   application   of   the   Immigrant   Utilities   Policy disproportionately impacts Latinos. The population of individuals who are unable to obtain essential municipal utility services from LaGrange based on the application of LaGrange's Immigrant Utilities Policy is overwhelmingly Latino; Defendant has no legally sufficient justification for denying essential municipal utility services based on an individual's inability to meet the requirements of its Immigrant Utilities Policy; and any legitimate, non-discriminatory interests that Defendant may identify can be achieved through other practices that have a less discriminatory effect.

## SECOND CAUSE OF ACTION
## Tortious Interference with Utility Services
### *For Injunctive and Declaratory Relief on Behalf of All Plaintiffs*

225.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

226.   The provision of utility service by the City constitutes a ministerial or proprietary act.

227.   As a utility provider, the City of LaGrange has a common law public duty to provide services on nondiscriminatory terms to all individuals within the service area who agree to comply with reasonable rules and procedures. *See Gas Light Co*, 225 Ga. 851 at 853.

228.   In engaging in the conduct complained of herein, including in Paragraphs 50-75, 78-98, and 105-113 above, including the unjustified conditioning of the provision of utility services on the payment of unrelated court debt owed to the City and the requirement that applicants for utility services furnish an SSN and particular forms of identification that some individuals do not have and are categorically ineligible to obtain, Defendant has breached its duty.

229.   Defendant's breach of its common-law duty is the proximate cause of the injuries suffered by the Plaintiffs.

### THIRD CAUSE OF ACTION
### Unconscionability
***For Declaratory Relief on Behalf of Plaintiffs Brewer, Moreland, Walton, Georgia NAACP, and Troup County NAACP***

230.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

231.   LaGrange's Court Debt Policy is substantively and procedurally unconscionable.

232.   The City of LaGrange is the sole provider of essential utility services to those who reside therein.

233.   As set forth above including in Paragraphs 50-75 and 78-85, as a condition of accessing those essential utility services, the City requires applicants for utility services to agree to a contract of adhesion that contains the terms of its

Court Debt Policy, which are oppressive, unreasonable, and unnecessary to the needs of the City, and beyond the authority and powers conferred on the City of LaGrange.

234.   The City further unlawfully conditions access to essential utility services by demanding, upon express threat of disconnection, that some utility accountholders agree to a payment arrangement that also provides for service disconnection in the event that the accountholder does not pay the unpaid court debt according to its terms.

235.   Through its Court Debt Policy and contract of adhesion, the City, by extrajudicial process, evades and subverts the detailed and comprehensive scheme the State of Georgia has established for the collection of debt, including procedural and substantive statutory protections, which include limits on the amount and sources of income that can be collected through attachment, garnishment, or other means of executing the writ of fieri facias, as well as prohibitions on the attachment, garnishment or application of other similar debt collection mechanisms for certain sources of income.

236.   The City similarly evades and contravenes federal law protection of specified income streams, including but not limited to 42 U.S.C. § 407(a), which is designed to protect social security beneficiaries from claims of creditors.

237.   Through its circumvention and subversion of Federal and State statutory protections, the City unconscionably subjects residents with very low incomes to the punitive, coercive, unjust circumstances of having to forfeit otherwise protected funds to access essential water, gas, and electricity services.

238.   In light of all the circumstances, the City's Court Debt Policy and the contracts through which it seeks to enforce it are inherently unjust, ultra vires, and abhorrent.

### FOURTH CAUSE OF ACTION
**Fourteenth Amendment to the U.S. Constitution & 42 U.S.C. § 1983
– Equal Protection Under *James v. Strange*
For Injunctive and Declaratory Relief on Behalf of Plaintiffs Brewer,
Moreland, Walton, Georgia NAACP, and Troup County NAACP
For Damages on Behalf of Plaintiffs Brewer, Moreland, Walton, and
Georgia NAACP**

239.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

240.   As set forth above including in Paragraphs 32-35, 50-75, and 78-85 Defendant violates Plaintiffs' right to equal protection under the law, guaranteed by the Fourteenth Amendment to the United States Constitution, by withholding from them and otherwise conditioning their access to essential utility services on payment of unrelated debt to the City.

241.   LaGrange cannot "impose unduly harsh or discriminatory terms merely because the obligation is to the public treasury rather than to a private creditor." *James v. Strange*, <u>407 U.S. 128, 138</u> (1972). Defendant's Court Debt Policy violates the Equal Protection Clause by discriminating against public debtors and subjecting them to unduly harsh treatment. The policy singles out those with non-utility-related debt to the City for an alternative debt collection process that withholds, suspends, or terminates critically needed utility services without regard for state and federal protections meant to protect civil judgment debtors, imposing an unduly harsh debt collection practice on such persons (as well as their dependent household members).

## PRAYER FOR RELIEF

242.   WHEREFORE, Plaintiffs respectfully pray that the Court grant the following relief:

a.   Enter a preliminary injunction that enjoins Defendant from continuing to implement its Court Debt Policy and Immigrant Utilities Policy pending a resolution of the merits of this case;

b.   Enter a declaratory judgment finding that the conduct set forth in the foregoing causes of action violates the Fair Housing Act of 1968; that it breaches the duty LaGrange owes Plaintiffs; that any contract provision

67

arising out of or seeking to enforce the Court Debt Policy is substantively and procedurally unconscionable; and that LaGrange, GA Municipal Code § 20-1-7(h) violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

c.      Enter a permanent injunction prohibiting Defendant from engaging in the illegal discriminatory conduct described herein and requiring that it take all steps necessary to remedy the effects of such conduct and prevent similar occurrences in the future;

d.      Award the Plaintiffs Mr. Moreland, Mr. Brewer, Ms. Walton, and Ms. Williams compensatory damages, in an amount to be determined at trial, to fully compensate them for injuries including, but not limited to, out-of-pocket monetary losses; humiliation; embarrassment; mental anguish; emotional distress; the deprivation of rights; and other damages they have suffered as a result of Defendant's actions described above;

e.      Award Plaintiff Georgia NAACP compensatory damages, in an amount to be determined at trial, to fully compensate it for its diversion of resources, frustration of mission, and other damages it has suffered and will suffer as a result of Defendant's actions described above;

f.     Award Plaintiffs their reasonable attorneys' fees and costs, pursuant to 42 U.S.C. §§ 1920 and 3613;

g.     Award Plaintiffs prejudgment interest; and

h.     Award any such other relief as the Court deems fair and equitable.

## DEMAND FOR JURY TRIAL

243.  Plaintiffs request trial by jury as to all issues in this case.

[SIGNATURES ON NEXT PAGE]

69

Respectfully submitted this 3rd day of February, 2020.

**Atteeyah Hollie**
Sarah Geraghty
Georgia Bar No. 291393
Atteeyah Hollie
Georgia Bar No. 411415
SOUTHERN CENTER
FOR HUMAN RIGHTS
83 Poplar Street N.W.
Atlanta, GA 30303
(404) 688-1202
(404) 688-9440 (fax)
sgeraghty@schr.org
ahollie@schr.org

**Reed Colfax**
Reed N. Colfax*
Joseph J. Wardenski*
Alexa T. Milton*
RELMAN COLFAX PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888
(202) 728-0848 (fax)
rcolfax@relmanlaw.com
jwardenski@relmanlaw.com
amilton@relmanlaw.com


*Appearing pro hac vice*

**Mayra B. Joachin**
Mayra B. Joachin*
Robin L. Goldfaden*
NATIONAL IMMIGRATION LAW
CENTER
3450 Wilshire Blvd., Suite 108-62
Los Angeles, CA 90010
(213) 639-3900
(213) 639-3911 (fax)
joachin@nilc.org
goldfaden@nilc.org

Kevin Herrera*
NATIONAL IMMIGRATION LAW
CENTER
PO Box 32358
Chicago, IL 60632
(213) 770-1325
(213) 639-3911 (fax)
herrera@nilc.org

# EXHIBIT

# A

# City of LaGrange

200 Ridley Ave., LaGrange, GA 30240  *  Phone: (706) 883-2040  *  Fax: (706) 883-2083

Civil Case#: ████████

**August** ██ **, 2016**

████████

Dear Sir / Madam:

You have an outstanding *Past Due Fine* balance in the amount of ████████ $ ██████
This balance has been added to your current City of LaGrange utility account per City Ordinance
(20-1-7h).

In order to avoid interruption of service, your utility account must not have an arrears
and you must contact the Collection Department, Room 103, at City Hall to make
arrangements to pay the above fines.

**City of LaGrange**
**Collection Department**

**EXHIBIT**

**B**


**LAGRANGE** *georgia*
S M A R T   M O V E
**www.lagrange.net**

## UTILITY SERVICE APPLICATION

P.O. Box 430, LaGrange, Georgia 30241
706-883-2030  706-883-2041 fax
utilities@lagrange.net

_____
Name of Applicant  (First Middle Maiden Last)

_____
Name of Co-Signer or Co-Applicant (**FOR JOINT APPLICATION**)

_____
Address You Are Moving To

_____        _____
Daytime (Work) Phone                 Cell or Home Phone

_____        _____
Driver's License or ID Number          State

_____        _____/_____/_____
Current Employer  (**or write none**)       Birthday

[ | | | - | | - | | | | ]
Social Security Number (Required, see below)

[ ] OWN     [ ] RENT     _____/_____/_____
                          Date You Want Services ON

Mailing Address (if different) : _____

_____

Address You Are Moving From: _____

_____

_____        _____/_____/_____
                          Date you want services OFF

Other Adults at Location (**or write none**):_____

_____

Landlord Name & Phone _____

---

**TO BE COMPLETED BY THE CITY**        Order #:_____

Date Completed: _____  CSR:_____

New  Acct #: _____

Landlord #: _____        Cust #: _____

Delinquency Risk: _____%     Deposit: $_____

Prior Acct #:_____        Balance: $_____

Prior Acct #:_____        Balance: $_____

Category:        [ ] Residential    [ ] Commercial

Services:   [ ] E   [ ] G   [ ] W   [ ] S   [ ] R   [ ] T   [ ] M

Comments:_____

_____

_____

_____

---

**DEPOSIT** – Residential, and unincorporated commercial deposits are based your personal credit score provided  by Online Utility Exchange.  Corporate deposits are set by City Code at twice the estimated utility bill paid in advance by cash, surety bond, or letter of credit.

### Commercial Applicant Information (check one):

[ ]  Sole Proprietorship /Partnership        [ ]  Corporation

Home Office Address and Phone  (if different):_____

_____

_____

Tax ID Number: _____

---

By signing this application, Applicant acknowledges the following: 1. The above information is true and correct to the best of my knowledge (Note: City Code Section 20-1-11 states that it is unlawful for any person to obtain or attempt to obtain utility service by deceitful means or artful practice which includes providing false information during the application process); 2. Applicant will pay all applicable utility charges and fees for service at the above location and any other debt owed to the City including court judgments and fines; 3. Penalties may be charged for late payment and service will be discontinued for failure to pay all charges by the due date shown on monthly billing statements; 4. Sanitation charges are not optional within the City limits except for commercial customers with dumpster service or vacant rental property in a certified Landlord's name;  5. Pursuant to the Privacy Act of 1974, the City requires a Social Security number in order to verify the identity of individuals applying for utility service, 6. The City can access my credit information from a third part Credit Agency and verify my employment for the purposes of determining my deposit and collecting unpaid amounts, 7. Any debt owed to the City of LaGrange including but not limited to court judgments and fines shall be paid prior to obtaining utility service, 8. Applicants with delinquent amounts owed to the City of any type shall be subject to having utility services terminated for failure to pay said debts.

**APPLICANT SIGNATURE:** _____     **DATE:** _____

_____        _____/_____/_____        [ | | | - | | - | | | | ]
Signature of Co-Signer            Birth Date of Co-Signer         Social Security Number of Co-Signer

By co-signing , you acknowledge you have read this notice and agree to pay the full amount of any debt owed by the Applicant on this utility account , which may include late fees and collection costs. The City may attempt to collect this debt from you without first trying to collect from the Applicant by filing suit, garnishing wages, adding this debt to your utility account(s), or other legal means.